UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID JOHNSON,

                    Plaintiff,

    –against–

KILOLO KIJAKAZI, COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.

20-CV-02630 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff David Johnson brings this action pursuant to §§ 205(g) and 1631(c)(3) of the

Social Security Act (the Act), 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a final

determination of the Commissioner of Social Security (Commissioner) denying his application for

Disability Insurance Benefits (DIB). The parties consented to the disposition of this case by a

United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Dkt. No. 13) and cross-moved for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Dkt. Nos. 25, 31.)[1]

Plaintiff seeks benefits for the closed period of March 10, 2011, to September 1, 2017. *See*

Pl. Mem. (Dkt. No. 26) at 1. The parties agree that Administrative Law Judge (ALJ) Dennis Katz,

who found plaintiff not disabled on August 13, 2018, erred in that he (i) "did not follow a specific

directive" in an earlier remand order issued by the Appeals Council and (ii) "did not 'carefully

consider' all the evidence presented concerning Plaintiff's symptoms." Def. Mem. (Dkt. No. 31)

at 5. However, the parties disagree as to whether the Court should remand solely for calculation of

benefits, as plaintiff urges, *see* Pl. Reply Mem. (Dkt. No. 34) at 1, or for further administrative

proceedings, as argued by the Commissioner. *See* Def. Mem. at 7-11. For the reasons that follow,

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the current Acting Commissioner of Social
Security, is substituted for former Acting Commissioner Andrew Saul as the defendant in this case.

I conclude that the case should be remanded for further administrative proceedings. Consequently, the Commissioner's motion will be granted; plaintiff's motion will be granted in part; and the case will be remanded for further proceedings.

## I.     BACKGROUND

### A.     Personal Background

Plaintiff was born on January 19, 1969. (R. 75).[2] He graduated from college, served in the Air Force, worked at a computer helpdesk, and then as a police officer in New York City from 2002 to 2011. (R. 57, 156-57.) On January 13, 2010, while on duty, plaintiff slipped down the stairs in pursuit of a suspect, injuring his lower back, right ankle, right knee, and right hand. (R. 251, 345.) He underwent surgery on his right knee on June 17, 2010, and on his right ankle on March 10, 2011, after which he returned to work – on light desk duty – until November 29, 2011, when his application for accident disability retirement was approved by the Medical Board of the Police Pension Fund, which found that he was "disabled from performing the full duties of a New York City Police Officer." (R. 315.) Almost five years later, on or around September 1, 2017, plaintiff returned to the workforce with a job configuring computer systems. (R. 414-18.)

### B.     Procedural Background

#### 1.     Disability Insurance Benefits Application

Plaintiff applied for DIB on February 8, 2013, alleging disability since March 10, 2011, due to injuries of the right hand, right knee, right ankle, and low back, and incontinence. (R. 75.) The SSA initially denied the claim on June 7, 2013. (R. 90.)

_____

[2] References to "R. __" are to the Social Security Administration (SSA) Administrative Record (Dkt. No. 14).

### 2. 2014 Decision

Plaintiff timely requested a hearing (R. 102), which took place on April 24, 2014, before ALJ Katz. (R. 47-68.) Plaintiff appeared in person, represented by counsel. (R. 47.) In a written decision dated August 26, 2014 (2014 Decision), the ALJ found that plaintiff continued to engage in substantial gainful activity (SGA) until November 29, 2011 (eight months after his alleged onset date of March 10, 2011), and that he was not disabled within the meaning of the Act at any time from that alleged onset date through the date of the 2014 Decision. (R. 31-40.)

### 3. Appeals Council Decision and Remand Order

After the Appeals Council denied plaintiff's request for review of the 2014 Decision (R. 1-3), plaintiff sought judicial review. In that action, docketed as *Johnson v. Colvin*, No. 15-CV-9906 (PGG) (DCF) (S.D.N.Y.), the parties stipulated to vacate the 2014 Decision. (R. 458.) On remand, the Appeals Council directed the ALJ to: (1) "further evaluate the severity of the claimant's cervical radiculopathy and whether he has limitations in [his] right hand," (2) "further evaluate whether the claimant's impairments meet or equal severity of an impairment listed in Appendix 1, Subpart P, Regulations No. 4 [the Listings] [and] in so doing, obtain medical expert evidence," (3) give further consideration to the claimant's maximum residual functional capacity (RFC) by (i) providing specific references to evidence in support of the assessed limitations and (ii) evaluating the treating and non-treating medical source opinions, explaining the weight given to such opinion evidence, and requesting additional evidence and clarification from the sources "[a]s appropriate," and (4) if warranted by the expanded record, "obtain evidence from a vocational expert to clarify the effect of the assessed limitation on the claimant's occupational base." (R. 463-64.)

### 4. 2018 Decision

On December 19, 2017, plaintiff once again appeared in person before ALJ Katz,

represented by counsel. (R. 409-32.) During the hearing, plaintiff confirmed, through his counsel, that he sought to "amend to a closed period." (R. 411.) Specifically, counsel explained, plaintiff sought DIB for a closed period from November 2011, when he retired from his job as a police officer, to September 1, 2017, when he "started feeling much better" and returned to work putting in "networks, computer networks," at banks. (R. 414-17.) Vocational Expert (VE) Louis Szolloscy also appeared and testified by telephone. (R. 422-32.)[3] However, no medical expert appeared, and no medical interrogatories were served or answered.

In a written decision dated August 13, 2018 (2018 Decision) (R. 31-40), the ALJ found that plaintiff was not disabled within the meaning of the Act at any time from March 10, 2011 to September 1, 2017, and therefore was not entitled to DIB. (R. 398-99.) On August 28, 2018, plaintiff submitted exceptions, but on January 23, 2020, the Appeals Council rejected them, rendering the 2018 Decision the final decision of the Commissioner. (R. 371-72.)[4]

## II.   MEDICAL EVIDENCE

### A.   Treatment Records

On January 13, 2010, as noted above, plaintiff injured his lower back, right ankle, right knee, and right hand in a fall. (R. 251.) MRIs performed in the months following plaintiff's injury indicated that he had lumbar radiculopathy, a "bucket-handle type tear" in the right meniscus, a

---

[3] The VE's name is misspelled (as "Celozzi") in the hearing transcript, but correctly spelled in the ALJ's letter dated December 21, 2017, after the hearing concluded, asking the VE to supplement the information testified to at the hearing (R. 627), and of course in VE Szolloscy's response, dated April 18, 2018. (R. 629.)

[4] The Appeals Council found that the ALJ "adequately evaluated the treating source opinions and provided cogent reasons for the weight afforded the opinions"; that the ALJ "applicably found, based on vocational expert testimony, that the claimant retained the transferrable skills from the job of police officer"; that the ALJ performed "an appropriate symptom evaluation, with consideration of all relevant factors"; and that the written exceptions did not provide a basis for changing the ALJ's decision. (R. 371-72.)

fracture in the distal fibula in his right ankle that was "largely healed," and some "degenerative changes" in the lumbar spine, "most prominent" at L3-4 and L5-S1. (R. 297-99.) On June 17, 2010, plaintiff underwent right meniscus repair and anterior cruciate ligament (ACL) reconstruction surgery performed at Montefiore Medical Center (Montefiore). (R. 50, 318, 349.) On March 10, 2011, he underwent lateral ligament reconstruction on his right ankle, also at Montefiore. (R. 50, 288, 349.) Thereafter, he was followed throughout 2011 by various physicians in the Montefiore Department of Orthopedics (R. 290-300), who administered a cortisone shot in his right ankle, referred him to physical therapy for his back pain, and advised that if he did not respond to physical therapy, lumbar epidural injections would be discussed. (R. 292, 295.)

From June 20, 2011 through November 9, 2015, plaintiff saw physiatrist Imelda M. Cruz-Banting, M.D., complaining primarily of lower back pain, right knee pain, right ankle pain, numbness and tingling of the feet (R. 251-73, 924-40), and intermittent urinary leakage "when his back pain is severe." (R. 267.) Dr. Cruz-Banting recommended continued physical therapy, as well as trigger point injections to treat his lower back pain and spasms, and ordered diagnostic EMG/NCS tests of the upper and lower extremities. (R. 256, 259, 262, 265, 268.) The EMG/NCS tests suggested right S1 radiculopathy and cervical radiculopathy. (R. 243.) Plaintiff's straight leg raise (SLR) test was positive at 70 degrees bilaterally, as was his Tinel's test in the right volar wrist. (R. 252, 253, 258.)[5] On June 20, 2011, Dr. Cruz-Banting wrote that plaintiff was

---

[5] "The straight leg raise test is used to evaluate for lumbar nerve root impingement or irritation. This is a passive test in which each leg is examined individually. It can be performed with the patient in a seated or lying position." Medscape, *Examination of Low Back Pain Technique*, https://emedicine.medscape.com/article/2092651-technique#c6 (last visited November 23, 2021). "A positive test is demonstrated when reproduction of symptoms radiating down the leg is produced at 30-70° of leg elevation." *Id.* Tinel's test, most commonly used when carpal tunnel syndrome is suspected, "involves tapping the nerve in the carpal tunnel at the wrist to see if it causes tingling in your fingers." Mayo Clinic, *When Hands Need a Helping Hand*,

"temporarily totally disabled in relation to his job description." (R. 253.) On July 18, September 8, and October 13, 2011, however, she wrote that he could continue on "limited" or "restricted duty (office/desk job)" with no climbing or running and "limited walking only." (R. 256, 259, 262.)

On January 14, 2013, plaintiff visited physiatrist Steven Huisch, M.D., for evaluation. (R. 249-50.) Dr. Huisch suggested lumbar epidural shots, "home stretching," and possibly joint replacement of the knee if plaintiff's osteoarthritis progressively worsened. (R. 250.) Plaintiff saw Dr. Huisch again on May 6, 2013, and February 11, 2014, at which point Dr. Huisch again recommended lumbar epidural injections, and plaintiff said he would like to proceed with them. (R. 358, 360.) Apparently, however, no injections were administered at that time.

On March 9, 2014, plaintiff presented at the Bronx Veterans Affairs Medical Center (VA Hospital) emergency room with "sharp pain" to his lower back, which was "not relieved by naproxen," the non-steroidal anti-inflammatory drug he had been taking for his back pain. (R. 328.) Plaintiff was prescribed cyclobenzaprine (a muscle relaxant) and a short course of oxycodone/ acetaminophen (a narcotic pain medication). (R. 330-32.)

On March 1, 2016, plaintiff was rear-ended while driving his car. (R. 692.) Two days later, he visited the VA Hospital for pain at the base of his head, which radiated down, and was given a cervical collar and instructed to take Tylenol. (R. 692-711.) On March 3, 2016, an MRI of the cervical spine revealed a moderate left neural foraminal herniation at C6-7, and a small left paracentral/neural foraminal disc herniation at C7-S1, with no central spinal stenosis. (R. 922.) On April 15, 2016, an MRI of the lumbar spine revealed narrowing of the disc space at L3-4 through L5-SI, as well as endplate abnormalities. (R. 919–20.) From April 15, 2016 through November 28,

---

https://www.mayoclinichealthsystem.org/hometown-health/speaking-of-health/when-hands-need-a-helping-hand (last visited November 23, 2021).

2016, plaintiff was given a series of cervical trigger point injections and lumbar paravertebral nerve blocks under the care of orthopedist David Ronald Dynof, M.D., at Orthopedics and Pain Management. (R. 680-89, 957-80.)

From April 3 through June 8, 2017, plaintiff pursued a course of physical therapy for his neck pain at the VA Hospital. (R. 734-54.) On June 25, 2017, he went to the VA Hospital complaining of chronic lower back pain and a burn from sleeping on a heating pad. (R. 721-33.) From June 27 through July 20, 2017, he attended "back school" at the VA Hospital. (R. 712-20.)

### B.      Opinion Evidence

#### 1.      Dr. Huisch

During his January 14, 2013 evaluation, Dr. Huisch reviewed plaintiff's medical records and conducted a physical examination. (R. 249-50.) Plaintiff had an antalgic gait and some difficulty getting on and off the examination table. (R. 249.) His low back had "marked dorsal paravertebral tenderness with spasms at L4-L5 and L5-S1" and limited range of motion. (*Id*.) Dr. Huisch found that plaintiff's right trigger points were greater than the left and there was tenderness of the right piriformis and sciatic notch. (*Id*.) The lower extremity examination revealed postsurgical changes of both knees, including osteoarthritic changes. (R. 250.) Dr. Huisch stated that plaintiff had atrophy with weakness of the quadriceps and adductor, as well as moderate weakness of the hamstring. (*Id*.) The exam also revealed swelling of the right ankle and marked restriction of the dorsi and plantarflexion. (*Id*.) Dr. Huisch opined that plaintiff was "totally disabled from any occupation." (*Id*.)

#### 2.      Kruan Keolamphu, M.D.

On May 17, 2013, plaintiff saw consulting examiner Dr. Keolamphu, on referral from the Division of Disability Determination, for an internal medicine examination. (R. 301-06.) Plaintiff informed Dr. Keolamphu that his chief complaint was "low back pain over the past five to six

years," along with right ankle pain, bilateral knee pain, urinary incontinence, and diabetes. (R. 301-03.) Plaintiff stated that he was "able to dress, bathe, shower, care for his . . . daughter, and shop, but with assistance. Cooking, cleaning, and laundry is done by his wife." (R. 303.)

Dr. Keolamphu noted that plaintiff did not appear to be in "acute distress" but displayed an "antalgic gait," "could not walk on his heels or toes," "maintains one half of [a] squat," needed no assistance changing or getting on and off the exam table ("but does so slowly") and was "able to rise from chair without difficulty but requires increased time to complete this task." (R. 304.) Dr. Keolamphu also noted that plaintiff's cervical and lumbar spine showed restrictions in flexion and extension, as well as lateral flexion. (R. 305.) His SLR test was positive "in both the sitting and supine positions, more pronounced over the right leg than the left at 30 degrees" (*id*.), and he had restricted ranges of movement in both hips, knees, and ankles. (*Id*.) However, "he was able to maintain 90 degrees of flexion and extension of the hip and the knee on sitting and moving[,] from sitting to standing and siting to supine," his hand and finger dexterity was "intact," and his grip strength was 5/5 (full) bilaterally. (*Id*.) Dr. Keolamphu opined that plaintiff had "marked restriction for prolonged standing, walking, squatting, kneeling, as well as heavy lifting and carrying in light of numerous traumatic injuries to the back, knees, ankles, chronic pain, and increased urinary incontinence with increased pain." (R. 306.)

### 3.    Dr. Cruz-Banting

Dr. Cruz–Banting, who treated plaintiff from 2011 to 2014, submitted a Functional Assessment dated March 26, 2014 and a narrative report in the form of a letter dated April 7, 2014. (R. 343-52.) In the Functional Assessment, Dr. Cruz–Banting opined that plaintiff could stand or walk for "less than 2 hours" in an eight-hour work day, could sit for "less than 4 hours" in an eight-hour work day, could lift or carry "more than 5 pounds but less than 10 pounds" occasionally (up

to 1/3 of the time), and could lift or carry "less than 5 pounds" occasionally. (R. 343.) She checked boxes to indicate that plaintiff's ability to work a full-time job would be limited because (among other things) he would require periods of bed rest "during the work day," as well as frequent breaks; he suffered from pain that prevented him from performing eight hours of work; he required medications that would interfere with his ability to function in a work setting; and he would need an average of two or more sick days off each month. (R. 344.)

In her narrative report, Dr. Cruz-Banting stated that as of his last physical examination on March 26, 2014, plaintiff had an "antalgic gait on the lower extremities," limited flexion and extension in the lumbosacral spine, and limited right and left knee flexion. (R. 350.) His SLR test was positive at 70 degrees and Tinel's sign was positive on the right. (*Id.*) Dr. Cruz-Banting noted that plaintiff "continued to present subjective complaints and objective findings relative to the lumbosacral spine, right knee, right ankle and right hand" and that the "weakness created in the supporting structure of the LS spine, right knee, right ankle and right hand will most likely predispose [the] areas to degeneration as well as recurrent pain syndromes of a muscular, ligamentous or neurological nature." (R. 351.) Dr. Cruz-Banting opined that plaintiff had "a permanent marked partial disability for all the injuries sustained" from the January 13, 2010 accident and was "not able to do even [a] sedentary job." (*Id.*)

### 4.    Michael Hearns, M.D.

Dr. Hearns, who is board-certified in occupational medicine, submitted a Functional Assessment and narrative report, both dated April 20, 2014. (R. 363-70.) In the Functional Assessment, Dr. Hearns opined that plaintiff could stand or walk for "less than 2 hours" in an eight-hour workday, could sit for "less than 4 hours" in an eight-hour workday, could lift or carry "more than 5 pounds but less than 10 pounds" occasionally, and lift or carry "more than 5 pounds, but

less than 10 pounds" occasionally. (R. 364.) Like Dr. Cruz-Banting, Dr. Hearns checked boxes to indicate that plaintiff's ability to work a full-time job would be limited because (among other things) he would require periods of bed rest "during the workday," as well as frequent breaks; he suffered from pain that prevented him from performing eight hours of work; and he would need an average of two or more sick days off each month. (R. 365.)[6]

In the narrative report, Dr. Hearns stated that he had been treating plaintiff since January 3, 2013,[7] and that plaintiff's complaints included "persistent and constant back pain with numbness and tingling sensation radiation to the right leg, chronic right knee and ankle pain." (R. 366.) Dr. Hearns wrote that on physical examination plaintiff had a "slight antalgic gait," "acute tenderness" in the right ankle, "multiple trigger points and muscle spasm" in the lower back, as well as limited range of motion, "decreased sensation to pinprick in the left leg and blunted deep tendon reflexes in both lower extremities." (R. 369.) Dr. Hearns opined that plaintiff had a "total and permanent disability" and was "unfit to perform any competitive job in the USA job market." (*Id.*) He added that "the combination of chronic pain syndrome and his anticipated absences from work, would interfere with [plaintiff's] ability to perform the essential duties of any job with or without modifications." (*Id.*)

### 5.   Catherine Pelczar-Wissner, M.D.

On June 27, 2017, plaintiff saw consultative examiner Dr. Pelczar-Wissner, on referral from the Division of Disability Determination, for another internal medicine examination (R. 654-57), after which Dr. Pelczar-Wissner completed a Medical Source Statement dated July 11, 2017.

---

[6] Unlike Dr. Cruz-Banting, Dr. Hearns did not check the box indicating that plaintiff's medications interfered with his ability to work. (R. 365.)

[7] Dr. Hearns states that he saw plaintiff on "many subsequent visit(s)" thereafter and that his most recent visit was on April 4, 2014. (R. 366.) However, there are no treating or progress notes from any of these visits in the administrative record.

(R. 661-66.) In her examination report, Dr. Pelczar-Wissner wrote that plaintiff appeared "very uncomfortable," his gait was antalgic, he could not walk on his heels or toes (though he "did try"), and his squat was "about 1/4 of full." (R. 655.) He needed no assistance changing or getting on and off the exam table and could rise from a chair without difficulty. (*Id*.) He had a limited range of motion in the cervical and lumbar spine but his SLR test was negative. (R. 656.) His reflexes and strength were normal, and no sensory deficit was noted. (*Id*.) Dr. Pelczar-Wissner opined that plaintiff had "marked" restrictions for bending, heavy lifting, carrying, pushing, or pulling activities, reaching overhead, kneeling, squatting, or bending, as well as climbing stairs, steps, and uneven terrain. (R. 657.)

In the Medical Source Statement, Dr. Pelczar-Wissner assessed that plaintiff could "occasionally" lift up to twenty pounds and carry up to ten pounds. (R. 661.) He could sit for one hour, stand for ten minutes, and walk for ten minutes without interruption. (R. 662). Within an eight-hour workday, he could sit for a total of six hours, stand for a total of one hour, and walk for a total of one hour. (*Id*.) In Dr. Pelczar-Wissner's view, plaintiff could occasionally push or pull, feel, finger, handle, reach overhead, and reach in other directions with both the left and right hands, and operate foot controls in both the left and right foot. (R. 663.) He could occasionally climb stairs and ramps, but never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. (R. 664.) Dr. Pelczar-Wissner wrote that plaintiff could occasionally tolerate operating a motor vehicle but could not tolerate unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, flames, pulmonary irritants, extreme cold or heat, or vibrations. (R. 665.)

According to Dr. Pelczar-Wissner, plaintiff could shop, travel without a companion, ambulate without a wheelchair, two canes, or two crutches, use public transportation, prepare a simple meal, care for his personal hygiene, and sort, handle or use papers and files, but could not

"walk a block at a reasonable pace on rough or uneven surfaces" or "climb a few steps at a reasonable pace with the use of [a] hand rail." (R. 666.)

### 6.   Julie Kaci, M.D.

On October 18, 2017, plaintiff saw consultative examiner Dr. Kaci, on referral from the Division of Disability Determination, for an orthopedic examination (R. 668-71), after which Dr. Kaci completed a Medical Source Statement dated November 10, 2017. (R. 673-78.) In her examination report, Dr. Kaci wrote that plaintiff was in "no acute distress," his gait was "normal," he walked on his heels or toes "without difficulty," and his squat was "1/3." (R. 669.) He needed no assistance changing or getting on and off the exam table and could rise from a chair without difficulty. (*Id*.) He had a limited range of motion in the cervical and lumbar spine, with tenderness on palpation, but no spasm or trigger points. (R. 670.) His SLR test was positive on both sides in the supine position, "as soon as I picked up each leg," but negative in the sitting position. (*Id*.) His reflexes and strength were normal, and no sensory abnormality was noted. (*Id*.) Dr. Kaci opined that plaintiff had "moderate limitations to kneeling, squatting, climbing stairs, lifting, carrying, pushing, pulling, and bending," and "[m]ild limitations to prolonged sitting, standing, walking, and activities requiring neck movement." (R. 671.)

In the November 10, 2017 Medical Source Statement, Dr. Kaci assessed that plaintiff could occasionally lift and carry up to 50 pounds, "frequently" (1/3 to 2/3 of the time) lift and carry up to twenty pounds, and "continuously" (over 2/3 of the time) lift and carry up to ten pounds. (R. 673.) He could sit for two hours, stand for two hours, and walk for one hour without interruption. (R. 674). Within an eight-hour workday, he could sit for a total of six hours, stand for a total of four hours, and walk for a total of four hours. (*Id*.) In Dr. Kaci's view, plaintiff could continuously feel, finger, handle, reach overhead, and reach in other directions with both the left and right hands,

12

and frequently push or pull with both hands. (R. 675.) He could operate foot controls with the left foot occasionally and with the right foot continuously. (R. 675.) Dr. Kaci wrote that he could occasionally climb stairs and ramps, but never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. (*Id.*) Dr. Kaci added that plaintiff could frequently tolerate operating a motor vehicle, unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, flames and pulmonary irritants, extreme cold, extreme heat, and vibrations. (R. 677.)

According to Dr. Kaci, plaintiff could shop, travel without a companion, ambulate without a wheelchair, two canes, or two crutches, use public transportation, prepare a simple meal, walk a block at a reasonable pace on rough or uneven surfaces, climb a few steps at a reasonable pace with the use of a hand rail, care for his personal hygiene, and sort, handle, or use papers and files. (R. 678).

### III.    HEARING

#### A.    Closed Period

As noted above, plaintiff's attorney advised ALJ Katz at plaintiff's December 19, 2017 hearing that plaintiff wished to "amend to a closed period," beginning in "November of 2011," when "the work ended," and running through September 1, 2017. (R. 411-14.)

#### B.    Plaintiff's Testimony

During his testimony, plaintiff confirmed that as of September 1, 2017, he was working in an "IT type" job setting up networks and configuring computers. (R. 414-16.) He explained that he began to feel better following the injections to his back in 2016, that he had further treatment to his neck and back at the VA Hospital in 2017, and that at the end of that treatment, "I started feeling much better." (R. 417-18.) His lawyer added that plaintiff was "still not working full time" (R. 420), but plaintiff himself did not testify as to his work hours.

### C.       Vocational Expert Testimony

VE Szolloscy testified that plaintiff's past work was as a Police Officer III, DOT (Dictionary of Occupational Titles) code 375.267-038, which was a "skilled occupation," at SVP level 7,[8] that was classified as "medium exertion" but "could be as high as heavy exertion depending if there was any restraining and things of that nature involved in his occupation." (R. 422.) The ALJ then presented the VE with a hypothetical claimant of plaintiff's age, education, and work experience, who could perform "occupations at the sedentary level that require no more than the occasional use of the bilateral upper extremities," and asked if he could identify any jobs for such a claimant. (*Id*.) VE Szolloscy identified one such job: "information clerk," DOT code 237.367-022, which is a "sedentary" and "semi-skilled" job at SVP level 4. (R. 424.) The VE testified that there were approximately 900,000 such jobs in the national economy. (*Id*.)

During cross-examination by plaintiff's counsel, the VE testified that an off-task percentage of "ten percent or greater," or "not showing up two or more days out of a four-week period consistently," would preclude competitive employment as an information clerk (R. 425-26), but that needing to be near a restroom would not affect a claimant's ability to perform the job. (R. 425.) If the job had to be performed with a "sit/stand option," the number of jobs available in the national economy would be eroded by 50 percent, but there would be no additional erosion for claimants who could only "occasionally rotate and flex their necks in all directions." (R. 426.) During reexamination by the ALJ, however, VE Szolloscy testified that if a person could only

---

[8] "SVP stands for 'specific vocational preparation' and refers to the amount of time it takes an individual to learn to do a given job." *Almodovar v. Berryhill*, 2019 WL 1313883, at *2 (S.D.N.Y. Mar. 22, 2019). "[U]nskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9." SSR 00-4p, 2000 WL 1899704, at *3 (Dec. 4, 2000).

"occasionally move his neck side to side or up and down," that would "preclude an[y] occupation, any competitive occupation." (R. 428.)

On December 21, 2017, following the hearing, the ALJ sent a letter to VE Szolloscy asking him to specify which police officer skills would be transferrable to the occupation of information clerk. (R. 627.) In his responding letter dated April 18, 2019, VE Szolloscy stated (citing the DOT and other government-issued reference works) that police officers have the skills to research and arrest perpetrators, prepare reports, relay complaints to agencies and dispatchers, issue citations or warnings, inform citizens of community service locations, provide road information to assist motorists, write and file daily activity reports, and use computers to retrieve data and file reports, while information clerks have the skills to research, retrieve information, answer inquiries for basic reports, provide information to the general public, complete basic forms, operate basic office equipment, answer basic inquiries from the public, resolve complaints skillfully, and set appointments. (R. 629.) As between the two positions, the transferrable skills, according to the VE, were "[p]ublic relation skills," "[r]ecordkeeping skills," "[b]asic computer skills," "[i]nformation retrieving," "[f]ollow verbal and written detail instructions and policies," and "[b]asic recordkeeping and brief report writing skills." (R. 629-30.)

No medical expert was present at the December 19, 2017 hearing. Nor are there any medical interrogatories in the record.

## IV.    ALJ DECISION

### A.    Standards

A claimant is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The

impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In the 2018 Decision, the ALJ correctly set out the five-step sequential evaluation process used pursuant to 20 C.F.R. § 404.1520(a) to determine whether a DIB claimant over the age of 18 is disabled within the meaning of the Act. (R. 382-83.) The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. §§ 404.1520(a)(4). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). To support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given his residual functional capacity (RFC), age, education, and past relevant work experience. 20 C.F.R. § 404.1560(c). "Under the law of this

Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

Prior to steps four and five, the ALJ must determine the claimant's RFC, that is, the "most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, the objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. § 404.1545(a)(3).

### B.    Application of Standards

The ALJ determined that plaintiff last met the insured statute requirements of the Act (making him eligible for DIB) on March 31, 2018. (R. 384.) At step one, the ALJ found that the plaintiff "did not engage in substantial gainful activity during the closed period of March 10, 2011 to September 1, 2017." (*Id*.)[9]

At step two, the ALJ found that during the closed period plaintiff had "the following severe impairments: back impairments; impairments of the lower extremities; a torn anterior cruciate ligament with surgical reconstruction; a torn medial meniscus with surgical repair; a right knee impairment; a right ankle impairment; ankle instability with non-union of distal fibula; and, mild to moderate degenerative arthritis of the left knee with prior ACL reconstruction[.]" (R. 384).

---

[9] Notwithstanding the colloquy at the December 19, 2017 hearing, the ALJ wrote that plaintiff was "alleging a closed period of disability from *March 10, 2011* to September 1, 2017" (emphasis added), when he "successfully returned to the workforce." (R. 381.) The ALJ also noted, however, that plaintiff did not actually stop working until November 29, 2011, and that his earnings in 2011 were $55,003, which was "at substantial gainful activity (SGA) levels." (R. 384.) Consequently, plaintiff could not, even potentially, "be found disabled for purposes of the Social Security Act until November 29, 2011." (*Id*.)

At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any Listing. (R. 386.) He considered Listing 1.04 (disorders of the spine) but found that plaintiff's "back disorder does not rise to the level of meeting the spinal stenosis, nerve root, or spinal cord compression requirements" of the Listing. (*Id*.) The ALJ also considered Listing 1.02 (major dysfunction of a joint) but found that "the available medical evidence did not demonstrate the specified criteria[.]" (R. 388.)

> Before proceeding to step four, the ALJ determined plaintiff's RFC:
>
> During the closed period at issue (March 10, 2011 to September 1, 2017), the claimant retained the residual functional capacity to perform sedentary exertion levels of work as defined in 20 CFR 404.1567(a) in that he was able to sit for a total of six hours and stand/walk for a total of two hours (for each activity); and was able to lift/carry objects weighing a maximum of 10 pounds. He was able to frequently perform reaching, handling, and fingering.

(R. 388.)[10]

The ALJ acknowledged plaintiff's hearing testimony that "his 'disability' ended on September 1, 2017 due to medical improvement and a successful return to the work force," but found it inconsistent with the medical record, which, he wrote, "essentially shows no significant difference between his medical condition from the alleged onset date to September 1, 2017, the date he returned to work[.]" (R. 389.) Thus, in the ALJ's view, "if the claimant was able to work on September 1, 2017 at SGA levels, he was certainly able to work on June 1, 2017." (R. 390.) The ALJ further noted that plaintiff had no difficulty performing a sedentary "desk job" for the police department from March 10 through November 29, 2011, when he was "granted a disability

---

[10]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

retirement." (R. 392.) Thus, in the ALJ's view, since plaintiff had "the same disability" both before and after his retirement date, he remained able to perform sedentary work throughout the closed period. (*Id.*)

Evaluating plaintiff's subjective complaints of pain and other symptoms, the ALJ found that while his medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, his statements concerning their intensity, persistence, and limiting effects "are not entirely consistent with the medical evidence and other evidence in the record." (R. 391-92.) Here again the ALJ emphasized that plaintiff was able to work as a police officer, on desk duty, long past his alleged onset date; that when he applied for a disability pension he did not claim to be unable to perform sedentary work; and that the Medical Board "made no findings of difficulties with sedentary activities." (R. 392.) The ALJ added that plaintiff engaged in "a wide range of daily living activities" that were inconsistent with his allegations of disabling impairments, including shopping, driving, personal care, and childcare; and that his physicians' contemporaneous progress notes "make no mention of any complaints relating to difficulties 'sitting.'" (*Id.*)

Reviewing the medical opinion evidence, the ALJ once again did "not give controlling weight to the treating source opinion of Dr. Cruz[-Banting] or to the treating opinion of Dr. Hearns" (R. 393), because they were "not consistent with other substantial evidence in the case record including treatment notes, clinical findings, and reported activities of daily living." (R. 395.) The ALJ explained that Dr. Hearns' opinion, written shortly after plaintiff suffered "an exacerbation of symptoms" in April 2014, "actually represents an opinion related to a single event and not to the claimant's overall limitations in physical functioning for the previous three years." (R. 394.) As for Dr. Cruz-Banting's opinion, the ALJ found it to be inconsistent with her

contemporaneous treating notes (which in the ALJ's view were entitled to "greater evidentiary weight" than her "'checkoff' opinion, which was created for the sole purpose of assisting the claimant with his disability claim"), because those notes did not reflect any "complaints of problems with 'sitting'" (except for plaintiff's March 9, 2014 visit to the VA Hospital due to severe back pain while driving) or "difficulties with 'sedentary' types of activities." (R. 394-95.) The ALJ added that while plaintiff complained of "tingling" in the right hand, Dr. Cruz-Banting's treating notes "do not mention a significant inability for reaching, handling, and fingering." (R. 395.)

At step four, based on his RFC determination, the ALJ found that plaintiff was unable to perform any of his past relevant work. (R. 397.)

At step five, the ALJ found that, considering plaintiff's age, education, work experience, and RFC, he had "acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy." (R. 397.) The ALJ relied primarily on the follow-up report from VE Szolloscy to conclude that plaintiff's past work experience as a police officer left him with skills that could be transferred to the job of an information clerk, which is performed at the sedentary exertion level and only requires "occasional reaching, handling and fingering." (R. 397-98.) The ALJ therefore found that plaintiff was not under a disability, as that term is used in the Act, from March 10, 2011, through September 1, 2017. (R. 398.)

## V.    ANALYSIS

Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). To prevail on such a motion, a party must establish that no material facts are in dispute and that judgment must be granted to that party as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842

F.2d 639, 642 (2d Cir. 1988); *Claudio v. Comm'r of Soc. Sec.*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

### A. Standards

A reviewing court "may set aside an ALJ's decision only where it is based upon legal error or where its factual findings are not supported by substantial evidence." *McClean v. Astrue*, 650 F. Supp. 2d 223, 226 (E.D.N.Y. 2009) (citing *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, the district court must first decide whether the Commissioner applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008), *report and recommendation adopted*, 2008 WL 4449357 (S.D.N.Y. Oct. 1, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8.

Where, as here, the claim for benefits was filed prior to March 27, 2017, the court must also ensure that the ALJ complied with the treating physician rule, 20 C.F.R. § 404.1527(c), which required him to give controlling weight to the opinions of plaintiff's treating physicians so long as those opinions were well supported by medical findings and not inconsistent with other evidence in the record. Put another way: "The ALJ can discount a treating physician's opinion only if the ALJ believes that it 'lack[s] support or [is] internally inconsistent.'" *Ramos v. Comm'r of Soc. Sec.*, 2015 WL 708546, at *15 (S.D.N.Y. Feb. 4, 2015) (quoting *Duncan v. Astrue,* 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011)). If the ALJ assigns less than controlling weight to the opinion of a treating physician, he must give "good reasons" for doing so and must "comprehensively set forth [the] reasons for the weight assigned" to the opinion. *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)).

When evaluating a claimant's subjective statements regarding his pain, fatigue, or other limiting symptoms, the ALJ must follow a two-step process: first, he must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). This requirement stems from the fact that subjective assertions of pain *alone* cannot ground a finding of disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); 20 C.F.R. § 404.1529(a). At the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. 20 C.F.R. § 404.1529(a). At that step, the ALJ must consider "all of the available evidence," both medical and non-medical, including opinion evidence. 20 C.F.R. § 404.1529(c). As with any other finding of fact, "[a]n ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court." *Rivera v. Berryhill*, 2018 WL 4328203, at *10 (S.D.N.Y. Sept. 11, 2018) (citing *Osorio v. Barnhart*, 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006)). Thus, a district court will not "second-guess" the ALJ's credibility finding "where the ALJ identified specific record-based reasons for his ruling," *Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010) (summary order), and where the finding is supported by substantial evidence. *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). But if the ALJ adequately explains his reasoning, and if his conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. "Even where the administrative record may also adequately support contrary findings on

particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier*, 606 F.3d at 49 (citation and internal quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not substitute its judgment for that of the Commissioner").

### B.     The Parties' Contentions

In his moving papers, plaintiff advances two principal arguments. First, he asserts that the ALJ failed to follow the treating physician rule when he "improperly rejected well-supported and uncontradicted treating source opinion in favor of the ALJ's erroneous and unconvincing lay evaluation of the very same evidence[.]" Pl. Mem. at 1; *see also id.* at 15-23. Second, plaintiff contends that the ALJ's assessment of plaintiff's transferrable work skills was improper because it was supported only by the VE's "speculation about what Mr. Johnson might have done" as a police officer, rather than evidence as to what he actually did. *Id.* at 23-24. Plaintiff requests a remand solely for the "calculation of the disability benefits owed." *Id.* at 25.

In her responding papers, the Commissioner concedes that the ALJ erred, albeit for different reasons: First, the Commissioner writes, ALJ Katz failed to follow the Appeals Council's "specific order" to obtain the "assistance of medical expert evidence" in determining whether plaintiff's condition met or equaled Listing 1.04A (or any other Listing). Def. Mem. at 5-6. Second, according to the Commissioner, the ALJ failed adequately to consider "the factual evidence or plaintiff's subjective complaints as required by the regulations." *Id.* at 6. Based upon these errors, the Commissioner agrees that the case should be remanded, but for the purpose of further administrative proceedings rather than for calculation of benefits, explaining that "reversal for calculation of benefits is appropriate only when there is 'no apparent basis to conclude that a more complete record might support the Commissioner's decision.'" *Id.* at 7.

In his reply papers, plaintiff accepts the Commissioner's identification of the two errors described above, *see* Pl. Reply Mem. at 4, and adds another (that the ALJ failed to specifically address the severity of the claimant's cervical radiculopathy and whether he had limitations in his right hand, as directed by the Appeals Council, *id*.), but objects to a remand for further administrative proceedings. *Id*. In plaintiff's view, "the medical evidence overwhelmingly points to a sub-sedentary RFC"; the Commissioner " had ample opportunities to correct [her] step findings [sic] over a seven-year period"; and she offers no reason to believe that – after repeated errors by ALJ Katz – a "similar failure would not be visited upon Mr. Johnson in the proposed future proceedings." *Id*. at 1, 4.

### C.    The ALJ's Errors Require Remand

#### 1.    Appeals Council Directives

The parties are correct that the ALJ erred in failing to follow the Appeals Council's directive to further evaluate whether plaintiff's impairments met or equaled the severity of a Listing, including Listing 1.04A, and in so doing "obtain medical expert evidence." (R. 463.) Although the ALJ discussed Listing 1.04A at some length (R. 386-87), he did not obtain any medical expert evidence bearing on the issue. Nor, for that matter, did he consider any of the expert opinion evidence in the record during this portion of his analysis, relying instead on his own view of the raw medical evidence – and in some cases drawing what appear to be inappropriate medical conclusions from that evidence.[11] Similarly, although the Appeals Council directed the ALJ to

---

[11] For example, when discussing whether the record contained evidence of "positive straight leg raising test[s], sitting and supine" (as required to meet Listing 1.04A"if there is involvement of the lower back," *see* 20 C.F.R. Part 404, subpt. P. App'x 1 § 1.04A), the ALJ wrote that while the record contained a number of reports of examinations during which plaintiff "was said to have been tested positive on SLR," several of those reports, "on closer examination," showed that plaintiff's SLR test was positive only at 60 or 70 degrees, "which is considered normal" as opposed to "truly positive." (R. 387, 389, 395.) The ALJ does not identify the source of his view as to what

further evaluate whether plaintiff had "limitations in [his] right hand" due to his cervical radiculopathy (R. 463), the 2018 Decision does not mention Dr. Cruz-Banting's "positive and repeated findings regarding right wrist deficits," Pl. Mem. at 19, including his positive Tinel's test. (R. 252, 253, 258, 350.)

These errors alone are grounds for remand. SSA regulations provide that, on remand from the Appeals Council, the ALJ "*shall* take any action that is ordered by the Appeals Council and *may take any additional* action that is not inconsistent with the Appeals Council's remand order." 20 C.F.R. § 404.977(b) (emphasis added). Thus, "[t]he ALJ's failure to abide by the directives in an Appeals Council remand order constitutes legal error requiring remand." *Parks v. Colvin*, 2017 WL 279558, *3 (W.D.N.Y. 2017); *accord Oomen v. Berryhill*, 2017 WL 1386355, at *10 (S.D.N.Y. Apr. 17, 2017); *McGann v. Colvin*, 2015 WL 5098107, at *14 (S.D.N.Y. Aug. 31, 2015); *Savino v. Astrue*, 2009 WL 2045397, at *10 (E.D.N.Y. July 8, 2009).

Given the Commissioner's concession that the ALJ failed to comply with the Appeals Council's directives, "the Court need not reach [plaintiff's] remaining contentions." *Whitney v. Berryhill*, 2019 WL 1998865, at *4 (W.D.N.Y. May 7, 2019); *see also Parks v. Colvin*, 2017 WL 279558 at *3 n.3 ("[plaintiff] advances other arguments that she believes require reversal of the Commissioner's decision[;] [h]owever, because this Court disposes of this matter based on the ALJ's failure to follow the Appeals Council's remand order . . . [,] those arguments need not be reached"). In light of plaintiff's contention that the case should be remanded solely for calculation

---

is a "normal" SLR test result, which appears to be at odds with at least some medical authorities. *See* n.5, *supra*. Even assuming, *arguendo*, that the issue is debatable, it was error for the ALJ to substitute his own opinion as to what is "normal" for the expert medical advice that the Appeals Council directed him to obtain.

of benefits, however, at least some discussion of plaintiff's remaining assignments of error is appropriate.

### 2.    Subjective Complaints

The parties are also correct that the ALJ erred in his analysis of plaintiff's subjective reports of pain and other symptoms. An ALJ's credibility determination cannot be based on "mischaracterizations of the record." *Marrero Santana v. Comm'r of Soc. Sec.*, 2019 WL 2330265, at *10 (S.D.N.Y. Jan. 17, 2019), *report and recommendation adopted sub nom. Santana v. Comm'r of Soc. Sec.*, 2019 WL 2326214 (S.D.N.Y. May 30, 2019); *accord Henderson v. Berryhill*, 312 F. Supp. 3d 364, 369 (W.D.N.Y. 2018); *see also Morales v. Berryhill,* 2018 WL 679566, at *18 (S.D.N.Y. Jan. 8, 2018) ("Because the ALJ's credibility analysis is premised, in part, on a mischaracterization of the record, the undersigned cannot conclude that it is supported by substantial evidence."). Nor may the ALJ "cherry-pick" the record for evidence supporting his view of credibility while ignoring contrary evidence. *See Eldridge v. Colvin*, 2016 WL 11484451, at *15 (S.D.N.Y. June 29, 2016) ("On remand, the ALJ should re-evaluate his credibility determination to provide a valid basis for discrediting Plaintiff's subjective complaints, and avoid cherry-picking only the evidence which supports an unfavorable outcome for Plaintiff."), *report and recommendation adopted,* 2016 WL 6534258 (S.D.N.Y. Nov. 2, 2016); *Dailey v. Colvin*, 2017 WL 2569683, at *4 (W.D.N.Y. June 14, 2017) (remanding where "the ALJ's assessment of Plaintiff's subjective symptoms was legally flawed and not supported by substantial evidence because it cherry-picked evidence from the record that purported to detract from Plaintiff's credibility.").

Here, the ALJ rested his credibility determination largely on the plaintiff's demonstrated work capacity at the beginning and at the end of the closed period for which he seeks benefits,

including his ability to "perform 'desk duties' subsequent to the alleged onset date of March 2011" and his "return[] to full-time work as of September 1, 2017." (R. 392.) While plaintiff's ability to perform sedentary work for the police department for eight months after his alleged onset date is certainly relevant to his credibility,[12] the ALJ mischaracterized the medical record when he stated that it showed "no significant difference between his medical condition from the alleged onset date to September 1, 2017, the date he returned to work[.]" (R. 389.)

From April through November 2016 plaintiff was given a series of cervical trigger point injections and lumbar paravertebral nerve blocks. (R. 680-89.) Thereafter, from April through June 2017, he pursued a course of physical therapy for his neck pain at the VA Hospital (R. 734-54), and from June through July 2017, he attended "back school," also at the VA Hospital. (R. 712-20.) At the December 19, 2017 hearing, plaintiff testified that he began to feel better following the injections to his back in 2016, and that at the end of his treatment at the VA Hospital in 2017 he "started feeling much better." (R. 417-18.) Moreover, his testimony appears to be consistent with the results of his last two consultative examinations. On June 27, 2017, Dr. Pelczar-Wissner observed that plaintiff's gait was antalgic, he could not walk on his heels or toes (although he "did try"), and his squat was 1/4. (R. 655.) She opined that he could sit for no more than one hour a time, could stand or walk for no more than 10 minutes at a time, and could not walk a block at a reasonable pace on rough or uneven surfaces or climb a few steps at a reasonable pace. (R. 666.) Three months later, on October 18, 2017, Dr. Kaci observed that plaintiff's gait was normal, he could walk on heels and toes, and his squat was 1/3. (R. 669.) She assessed that plaintiff could sit for two hours at a time, stand for two hours at a time, and walk for an hour at a time, and that he

---

[12] During this period, his treating physician, Dr. Cruz-Banting, wrote repeatedly that he could "continue restricted duty" (office/desk job) with "no climbing or running" and "limited walking only." (R. 256, 259, 262.)

was capable of walking a block at a reasonable pace on rough or uneven surfaces and climbing a

few steps at a reasonable pace. (R. 674, 678.) I note as well that although the ALJ repeatedly stated

that plaintiff returned to "full time" work in September 2017 (R. 390, 392, 397), his attorney

asserted at the December 19, 2017 hearing that plaintiff was "still not working not full time" (R.

420) and plaintiff himself was never asked about his work hours. There is thus no evidence in the

record as to whether he was working full time or part time. I therefore conclude that the ALJ's

credibility determination was based in part on a distorted view of the record, which was error.

### 3.    Treating Physician Rule

The Court agrees with plaintiff that the ALJ failed properly to apply the treating physician

rule when he declined to give controlling weight to the opinion of Dr. Cruz-Banting (at least for

the period through the date of her narrative report on April 7, 2014) or set forth "good reasons"

for the decision not to do so. 20 C.F.R. § 404.1527(c)(2); *Greek*, 802 F.3d at 375.[13] Under the

treating physician rule, an ALJ may decline to afford the opinion of a treating physician

controlling weight where that opinion is "not consistent with other substantial evidence in the

---

[13] In his opening brief, plaintiff argues that the ALJ should have given controlling weight to the opinion of Dr. Hearns as well. Pl. Mem. at 17. It is not clear to this Court, however, that Dr. Hearns was in fact plaintiff's "treating physician," given that no treatment notes appear in the administrative record, which plaintiff's counsel stipulated, at the start of the second hearing, to be "complete." (R. 409.) *See* 20 C.F.R. § 404.1527(a)(2) ("Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)."); *Pantoja Santiago v. Comm'r of Soc. Sec.*, 2019 WL 6831533, at *16 (S.D.N.Y. July 23, 2019) (ALJ was not required to give physician's opinion "heightened deference" where administrative record documented only one appointment with that physician), *report and recommendation adopted*, 2019 WL 3798055 (S.D.N.Y. Aug. 13, 2019). Moreover, the ALJ is correct that Dr. Hearns' narrative report is based largely on plaintiff's self-reported symptoms and a review of prior medical reports. (R. 366-69.) Dr. Hearns devotes only one paragraph of the five-page report to his own examination of the patient, and does not state the date on which that examination occurred. (R. 369.) I therefore conclude that the ALJ did not err in declining to assign controlling weight to Dr. Hearns' opinion.

record." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). However, the mere existence of "discrete inconsistencies" in a lengthy medical record does not, standing alone, justify the rejection of the treating physician's opinion. The ALJ must "explain how these discrete inconsistences lead to the overarching conclusion that [the treating physician's opinion] should be given lesser weight." *Romero v. Colvin*, 2016 WL 74820, at *5 (E.D.N.Y. Jan 6, 2016). Even if the ALJ does not assign controlling weight to a treating physician's opinion, he must consider a variety of regulatory factors "to determine the amount of weight the opinion should be given." *Norman v. Astrue*, 912 F. Supp. 2d 33, 73 (S.D.N.Y. 2012).[14]

In weighing the medical opinion evidence – as in assessing credibility – an ALJ may not rely upon a factually inaccurate description of the record, *Zabala v. Astrue,* 595 F.3d 402, 409 (2d Cir. 2010), nor cherry-pick the treating notes or other medical evidence underlying the competing opinions. *See Marrero Santana v. Comm'r of Soc. Sec.*, 2019 WL 2330265, at *9 (S.D.N.Y. Jan. 17, 2019) (ALJ may not "selectively cite treating notes or diagnostic imaging that support the ALJ's own view while ignoring opinions and evidence that do not"), *report and recommendation adopted sub nom. Santana v. Comm'r of Soc. Sec.*, 2019 WL 2326214 (S.D.N.Y. May 30, 2019); *Annabi v. Berryhill,* 2018 WL 1609271, at *16-17 (S.D.N.Y. Mar. 30, 2018) (collecting cases).

Here, the ALJ stated that Dr. Cruz-Banting's opinion (concluding, in effect, that plaintiff "was unable to perform even sedentary work") was inconsistent with her own treating notes,

---

[14] Those factors include the "[l]ength of the treatment relationship and the frequency of examination"; the "[n]ature and extent of the treatment relationship"; the "[s]upportability" of the opinion, particularly by "medical signs and laboratory findings"; the "[c]onsistency" of the opinion with "the record as a whole"; the physician's level of "[s]pecialization" in the relevant medical field; and any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2).

which "do not indicate any complaints of problems with 'sitting'" (except for his report of severe back pain while sitting in his car, which prompted him to go to the emergency department at the VA Hospital), and "do not mention a significant inability for reaching, handling, and fingering." (R. 394.) The ALJ adds that Dr. Cruz-Banting's clinical findings in 2015 were "essentially benign" because, among other things, plaintiff's SLR tests were positive "only at 70 degrees bilaterally (i.e. 'normal')," and notes that as of January 22, 2015, plaintiff was "able to provide care for a newborn baby at home." (R. 395.)

In fact, Dr. Cruz-Banting's August 30, 2013 treating notes clearly document plaintiff's complaint that "'[h]is back would kill him after prolonged sitting." (R. 935.) Plaintiff made similar complaints to other medical providers (R. 301, 763, 916) and to the Medical Board of the Police Pension Fund. (R. 309.) Dr. Cruz-Banting's April 3 and May 23, 2013 treating notes report that plaintiff was experiencing numbness in the right hand, that his right grip was "-5/5," that his sensibility was "[d]ecreased to pinprick on right I & II fingers," and that Tinel's test was positive for the right volar wrist. (R. 937, 939.) Later treatment notes repeat many of the same findings. (R. 924-29, 931, 933, 935.) Moreover, while Dr. Cruz-Banting's January 22, 2015 treating notes do report that plaintiff had "a newborn baby to take care of at home" (contributing to his low back pain), they do not state or suggest that plaintiff was the baby's primary caregiver. (R. 926.) Since the ALJ's determination to assign less than controlling weight to Dr. Cruz-Banting's opinion is premised in part on an inaccurate description of her underlying treating notes (and other portions of the record), and in part on the ALJ's improper lay interpretation of the medical evidence (including his own view of what constitutes a "normal" SLR test result), I conclude that he has not provided "good reasons" for that determination.

### 4.    Transferable Work Skills

The Court rejects plaintiff's contention that the ALJ's assessment of his transferrable work skills was improper. Relying principally on *Draegert v. Barnhart*, 311 F.3d 468 (2d Cir. 2002), plaintiff argues that before a finding of transferable skills can be made, an ALJ must first make an "evidentiary finding that the claimant acquired the requisite level of skills either through job training or 'demonstrated proficiency with work activities in particular tasks or jobs.'" Pl. Mem. at 24 (quoting *Draegert*, 311 F.3d at 476). Thus, according to plaintiff, since there was no evidence in the record that he personally "wrote reports," "'researched' perpetrators," or "relayed requests to dispatchers" while serving as a police officer, it was error for the VE (and through the VE, the ALJ) to rely on a generic description of the skills required for the job of police officer drawn from the DOT and other reference works. Pl. Mem. at 24-35.

*Draegert* does not assist plaintiff. First, the plaintiff in that case was "of advanced age," 311 F.3d at 472, such that the ALJ was required to perform a transferable skills analysis. *See* 20 CFR § 404.1568(d)(4)) ("If you are of advanced age (age 55 or older), and you have a severe impairment(s) that limits you to sedentary or light work, we will find that you cannot make an adjustment to other work unless you have skills that you can transfer to other skilled or semiskilled work (or you have recently completed education which provides for direct entry into skilled work) that you can do despite your impairment(s)."). Plaintiff Johnson, by contrast, was 44 years old on his date last insured, making him a "younger individual age 18-44" at that time, and a "younger individual age 45-49" by the date of the 2018 Decision. (R. 397.)

Second, the issue in *Draegert* was the "difference between aptitudes and skills." 311 F.3d at 474. After a detailed discussion of the applicable regulations, the Second Circuit held that broad and vague "general[] abilities," such as the "ability to use reason and judgment in dealing with all

31

kinds of people," the "ability to think clearly and react quickly in an emergency," and the "ability to change easily and frequently from one activity to another," are "merely traits or aptitudes, not job skills[.]" *Id.* at 476. *Draegert* did not hold (as plaintiff suggests) that an ALJ must elicit testimony concerning each task performed by the claimant in his past relevant work before identifying his transferable skills.

Here, the ALJ found, based on information provided to him by the VE, that plaintiff had specific and concrete skills, such as "basic computer skills" and "brief report writing skills" (R. 397), learned as a New York City police officer. Since these are not mere "traits or aptitudes," *Draegert*, 311 F.3d at 476, the ALJ did not err in relying on them to determine that plaintiff had the transferable skills to perform the job of information clerk. *See Gittens v. Astrue*, 2008 WL 2787723, at *7-8 (S.D.N.Y. June 23, 2008) (ALJ did not err in citing the "ability to compute and develop reports" and "investigative skills" as skills that were possessed by a former New York City police officer and transferable to the jobs of fraud investigator or emergency dispatcher).

### D.     Remand for Further Proceedings is Appropriate

Under § 205(g) of the Act, the Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 205(g). Where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the appropriate remedy is to remand solely "for calculation and payment of benefits." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). On the other hand, where there is a basis to conclude "that a more complete record might support the Commissioner's decision," remand for calculation of benefits would not be appropriate, and the court instead should remand for further proceedings. *See Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999). Moreover, "absent a finding that the claimant was actually disabled, delay alone is an

insufficient basis on which to remand for benefits." *Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996); *accord Castorina v. Saul*, 2020 WL 6688961, at *24 (S.D.N.Y. Aug. 24, 2020), *report and recommendation adopted,* 2020 WL 6781078 (S.D.N.Y. Nov. 18, 2020).

Here, the record does not provide persuasive proof of disability at any time during the closed period defined by the plaintiff, and certainly does not do so for the entire period alleged (during the first eight months of which plaintiff continued to work at SGA levels). Nor can the Court rule out, on the present record, the possibility that a more complete record (including, for example, Dr. Hearns' treating notes) or an error-free analysis of that record by the ALJ, in compliance with the directions of the Appeals Council, would again support the initial denial of benefits. Moreover, while ALJ Katz has held two hearings, and issued two written decisions, he has only once failed to comply with the Appeals Council's instructions. *Cf. Salisbury v. Saul*, 2020 WL 913420, at *36 (S.D.N.Y. Feb. 26, 2020) (remanding for calculation of benefits as to a ten-month closed period where "the ALJ twice failed to comply with the Appeals Council's instructions to pursue further information and clarification from Drs. Mehar and Rochman, leaving the court 'no reason to believe that yet another remand will remedy those problems'"); *Mortise v. Astrue*, 713 F. Supp. 2d. 111, 128 (N.D.N.Y. 2010) (remanding for calculation of benefits where ALJ repeatedly erred in applying the treating physician rule and further development of the record would not affect the results.); *Steficek v. Barnhard*, 462 F. Supp. 2d 45, 421 (W.D.N.Y. 2006) (remanding for calculation of benefits where Commissioner committed "the exact same errors the second time around").

Even assuming that plaintiff is entitled to DIB for a closed period, a determination will have to be made as to when that period began and when it ended. This is a fact-intensive analysis best suited for the ALJ in the first instance. *See Sachs v. Astrue*, 567 F. Supp. 2d 423, 431

(W.D.N.Y. 2008) (remanding for further proceedings so that Commissioner can "obtain additional evidence and clarification, as she deems appropriate, from plaintiff's treating physicians concerning the final six months of the closed period"); *Pena v. Barnhart*, 2002 WL 31487903, at *12 (S.D.N.Y. Oct. 29, 2002) (case should be remanded "for the purpose of enabling the ALJ to make specific findings on the question of whether Plaintiff was entitled to disability benefits for any past, closed period"). For this reason as well, the case should be remanded for further proceedings.

## VI.    CONCLUSION

For the reasons set forth above, plaintiff's motion is GRANTED IN PART, the Commissioner's motion is GRANTED, and this action is REMANDED for further proceedings consistent with this Opinion and Order. The Clerk of Court is respectfully directed to close the case.

Dated: New York, New York                  **SO ORDERED.**
        November 24, 2021

_____
**BARBARA MOSES**
**United States Magistrate Judge**